IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL EDWARD DEWEY,<br><br>    Petitioner,<br><br>  vs.<br><br>D. K. SISTO, Warden, California State Prison, Solano,<br><br>    Respondent. | No. 2:08-cv-00580-JKS<br><br>MEMORANDUM DECISION |

Petitioner Paul Edward Dewey, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus Relief Under 28 U.S.C. § 2254. Dewey is presently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the California State Prison, Solano. Respondent ("State") has answered, and Dewey has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

Following a trial by jury, Dewey was convicted in the Los Angeles Superior Court on September 15, 1989, of one count of second-degree murder (Cal. Penal Code § 187(a)), one count of driving under the influence causing bodily injury (Cal. Vehicle Code § 23153(a)), and one count of driving under the influence (Cal. Vehicle Code § 23153(b)). The trial court sentenced Dewey to an aggregate indeterminate sentence of 21 years to life.[1] Dewey does not challenge his conviction or sentence in this proceeding.

---

[1] Dewey was sentenced to an indeterminate term of 15 years to life on the second-degree murder conviction and a consecutive determinate term of six years on the driving under the influence causing bodily injury conviction.

In February 2006 Dewey made his second appearance before the Board of Parole Hearings ("Board"), which denied him parole for a period of two years.  Dewey, appearing *pro se*, timely filed a petition for habeas relief in the Los Angeles County Superior Court, which denied his petition in an unreported, reasoned decision.  Dewey's subsequent petition for habeas relief was denied by the California Court of Appeal in an unreported decision citing *In re Dannenberg* (2005) 34 Cal. 4th 1061, 1097-98, 1070-71, and *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 653-54.  The California Supreme Court summarily denied review without opinion or citation to authority on February 20, 2008.  Dewey timely filed his petition for relief in this Court on March 11, 2008.

After briefing was completed, the United States Court of Appeals for the Ninth Circuit, sitting en banc, decided *Hayward v. Marshall*.[2]  At Docket No. 18 this Court entered its Order directing the parties to file supplemental briefs addressing the *Hayward* decision, in particular that "[t]he prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state' supports the inference of dangerousness."[3]  The Court also directed the parties to consider two Ninth Circuit decisions applying *Hayward*.[4]  Both parties have submitted supplemental briefing.

---

[2] 603 F.3d 546 (9th Cir. 2010) (en banc).

[3] *Hayward*, 603 F.3d at 562.

[4] *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per curiam), and *Cooke v. Solis*, 606 F.3d 1206 (9th Cir. 2010).

The facts of the crime as recited by the California Court of Appeal on direct appeal are:

> At approximately 3:00 p.m. on May 21, 1988, Martha Calderon was driving home from a shopping excursion. With her in the front seat was her seven-month-old daughter, Margaret. Her nephew, Jerry Ortiz, and her aunt, Silvia Martinez, were in the back seat. As Ms. Calderon stopped at the intersection and signaled for a left turn, her Dodge Horizon was rear-ended by a white truck, which was being driven by Dewey. As a result of the collision, Martha Calderon, her infant daughter, and her nephew were all seriously injured, and Silvia Martinez was killed.
> A bystander estimated Dewey's speed at fifty to sixty miles per hour when he struck Ms. Calderon's stationary vehicle. An accident reconstruction specialist estimated his minimum speed at 71.1 miles per hour at the point of impact.
> A motorist who stopped and assisted Dewey from the truck after the collision was unable to arouse him. The motorist observed beer cans in the passenger compartment of the truck. A police officer later counted four beer cans in the passenger compartment, one of which was empty. When Dewey's blood alcohol content was tested at a hospital shortly after the accident, it was .27 per cent. A criminalist estimated that Dewey's blood alcohol content would have been between .28 and .30 per cent at the time of the collision.[5]

## II. GROUNDS RAISED/DEFENSES

In his Petition, Dewey raises what appear to be three grounds: (1) that the finding that he presented a current unreasonable threat of danger to society is unsupported by any reliable evidence; (2) the Board is extending his prison term beyond the statutory maximum in violation of *Booker* and *Blakely*; and (3) the Board acted in excess of its authority by extending his denial of parole period from three to five years without notice, hearing or reasonable cause.[6] The State does not assert any affirmative defenses.[7]

---

[5] Docket No. 11-1, pp. 87-88.

[6] The third ground does not appear to be factually correct. The Board's denial was for a period of two years. Docket No. 11-1, p. 63.

[7] *See* Rules—Section 2254 Cases, Rule 5(b).

3

III.  DISCUSSION

The Board found that Dewey was unsuitable for parole and, if released on parole at that time, Dewey presented an unreasonable risk of danger to society and a threat to public safety.  In rejecting Dewey's challenge to the Board's action, the Los Angeles County Superior Court held:

> The Board found petitioner unsuitable for parole after a parole consideration hearing held on February 23, 2006.  Petitioner was denied parole for two years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.
> The Court finds that there is some evidence to support the board's finding that the commitment offense is especially heinous and atrocious. (Cal. Code Regs, tit 15, §2402, subd. (c)(1).)  In this case, "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit 15, §2402, subd. (c)(1)(E).)  An inexplicable motive is one in which the crime "does not appear to be related to the conduct of the victim and has no other discernible purpose.  A person whose motive for a criminal act cannot be explained or is unintelligible is, therefore, unusually unpredictable and dangerous" (*In re Scott* (2004) 119 Cal.App.4th 871, at 893).  In this case, petitioner killed one person and injured two [*sic*] more only because he was intoxicated.  The Board found that the motive was not related to the conduct of the victim, who "was stopped at the wrong place at the wrong time." (*Reporter's Transcript,* February 23, 2006, p. 107.)  The Board was justified in finding that the motive is unintelligible, therefore indicating an unpredictable and dangerous risk to public safety.  Additionally, multiple victims were attacked, injured or killed in the same incident. (Cal. Code Regs., tit 15, §2402, subd. (c)(1)(A).)  One victim died as a result of the collision and three others were severely injured, each requiring hospitalization for their injuries.  Because there is some evidence to support the Board's conclusion that petitioner is unsuitable for parole based on the above factors, the petition is denied.[8]

"When habeas courts review the 'some evidence' requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings."[9]  In its Order requesting supplemental briefing, this Court directed the State to

---

[8] Docket No. 11-1, pp. 150-51.

[9] *Cooke*, 606 F.3d at 1216.

"specifically identify those characteristics, other than the underlying commitment offense, that support a finding that release of the Petitioner to parole status poses a current threat to public safety, and point to the specific evidence in the record that supports that determination."[10] In its response, the State argues that, because *Hayward* was wrongly decided and represents circuit law, not the law as established by the Supreme Court, this Court need not follow *Hayward* or the Ninth Circuit cases applying *Hayward*. The State, asserting that the Order requiring that the evidence supporting the finding that the release of Dewey to parole status poses a current threat to public safety be identified is an improper question, declined to provide the required information.[11] This Court disagrees. A district court is bound by the published decisions of a panel of the Ninth Circuit until overruled or undermined by higher authority, e.g., an en banc decision of the Ninth Circuit, a Supreme Court decision, or subsequent legislation.[12] This has not occurred. This Court notes that if, as the State contends, *Hayward* was incorrectly decided, the appropriate remedy is to file a petition for a *writ of certiorari* in the Supreme Court within 90

---

[10] Docket No. 18, p. 2.

[11] If this were a single instance, this Court would be inclined to ignore the refusal to address *Hayward*. Unfortunately, this is not such an isolated incident. This Court has received several similar responses to its Orders in other parole cases that were held in abeyance pending the en banc decision in *Hayward*, e.g., *Walker v. Kramer*, Case No. 2:07-cv-00803-JKS, *Singer v. Sisto*, Case No. 2:08-cv-00048-JKS, and *Feliz v. Sisto*, Case No. 2:08-cv-01508-JKS, of which this Court takes judicial notice. Fed. R. Evid. 201. Consequently, this Court must conclude that the position taken in this case represents the official position of the State of California, acting through its Attorney General.

[12] *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). A complication exists because the *Hayward* court predicated a federally protected liberty interest on California state statutes, regulations, and California Supreme Court decisions. Thus, a California Supreme Court decision subsequent to *Hayward*, *Pearson*, and *Cooke* rejecting their reasoning might be highly relevant. No such case has been identified.

days of the date the petition for rehearing in *Hayward* was denied.[13] The 90-day period began to run June 2, 2010, when the Ninth Circuit denied Hayward's petition for a rehearing.[14] As the time for filing a petition for *certiorari* had not yet expired, if the State contemplated seeking *certiorari*, the State could have requested this Court to grant additional time to comply with the Order. Alternatively, the State could have preserved its arguments that *Hayward* was erroneously decided, for further appellate review, and still complied with the express terms of the Order. What the State could not do is what it did do in this case—ignore the clearly articulated requirements of *Hayward* and decline to obey this Court's specific order.[15] In so doing, even if the Order was "improper," the State did so at its own peril.[16]

---

[13] Supreme Court Rule 13.

[14] *Hayward v. Marshall*, Ninth Circuit Case No. 06-55392, Docket No. 120, of which this Court takes judicial notice. Fed. R. Evid. 201.

[15] Indeed, as a result of the failure of the State to comply with this Court's Order, the State appears to assume that this Court will mine the record to find sufficient evidence to support the decision of the California Supreme Court. It is unquestionably the rule that the burden of establishing a violation of a constitutional right sufficient to warrant habeas relief is placed on the petitioner. *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support"). That does not, however, mean that the petitioner has the burden of proving a "negative," i.e., that something does not exist. The State should not expect a federal district court to mine the record to find evidence that Dewey is currently dangerous, which, if found, would support a determination that, as required by *Hayward*, the California judicial decision approving the Board's decision rejecting parole was not an unreasonable application of the California some evidence requirement, or was not based on an unreasonable determination of the facts in light of the evidence.

[16] *See Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967) ("until its decision is reversed for error by orderly review, either by itself or by a higher court, [a court's] orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.") (quoting *Howat v. State of Kansas*, 258 U.S. 181, 189-90 (1922)); *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (same); *United States v. United Mine Workers of America*, 330 U.S. 358, 293 (1947) (same).

This Court treats the State's failure to point to the evidence in the record supporting the factors, other than the commitment offense, cited by the Board's finding that Dewey poses a present threat of danger to society, as conceding that no such evidence exists.[17]

In finding Dewey unsuitable for parole, the Board found:

> **PRESIDING COMMISSIONER GARNER**: [. . . .]  Mr. Dewey, the Panel's reviewed all the information received from the public and relied on the following circumstances in concluding you're not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if you were released from prison.  Sir, we started with the commitment offense.  And the Panel concludes this offense carried out in an especially cruel manner.  The outcome was especially cruel.  The Panel noted that your testimony today is you had no recollection from the time you left Santa Barbara until you found yourself handcuffed in a hospital.  We have multiple victims that were injured and Ms. Calderon was killed as a result of this accident.
>         The offense was carried out in a very dispassionate in that the reason you found yourself in an automobile traveling some great distance, actually and in a very congested area.  There for the grace of God could have been any other family.  It just so happened that Ms. Calderon was stopped at the wrong place at the wrong time.  The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering in that you had a vehicle traveling, which was estimated somewhere around 70 miles per hour.  No skid marks were detected.  You were driving a fullsize pickup truck.  The impact locked the vehicles together and they traveled some distance being locked together.  And the motive for this, there is no motive in my mind.  It's a situation where you placed yourself in harms way as a result of alcohol, which has been a demon in your life for many, many years.
>         And these conclusions were drawn from the Statement of Facts, and this was taken again from the August 2000 Board report wherein on May 21, 1988 at approximately 3:45 p.m., a vehicle driven by Martha Calderon was in the number one lane, eastbound on Hubbard Street waiting to make the left turn to go north on Eldridge Street, a pickup truck driven by prisoner Paul Edward Dewey traveling at

---

[17] This Court recognizes that the court in *Hayward* ultimately affirmed the denial of parole.  The Attorney General and his subordinates know the record in the case.  They also know the Ninth Circuit's decision in *Hayward* and the California Supreme Court decisions in *Lawrence* and *Shaputis*.  If the record in this case could be reconciled with those cases and the denial of parole, competent counsel would have so argued.  Because the Attorney General is competent counsel, the State's failure to develop the argument lends support to only one conclusion:  that the record will not support a finding of present dangerousness.

an estimated speed 70 miles an hour, rearended Calderon's vehicle. The posted speed limit for Hubbard Street was 40 miles an hour. Calderon's vehicle and Dewey's vehicle were locked by the collision and both traveled over 100 feet from the point of impact. Also in Calderon's vehicle were Margaret Calderon, age eight, in the front passenger seat, Sylvia Martinez, age 39, in the rear passenger seat, and Yerill Ortiz, Sylvia Martinez's eight year old son, in the rear passenger seat. Martinez was killed by the impact and the other three persons were seriously injured requiring hospitalization. Martha Calderon suffered serious facial injuries resulting in the loss of her left eye. She also suffered various other injuries that required hospitalization. Calderon's eight year old daughter suffered serious head injuries requiring brain surgery. It's not known if she suffered any permanent physical or mental damage. Yerill Ortiz suffered a broken nose, broken face bones, damage to the left eye and other injuries requiring medical treatment. It's not known if permanent handicap was a result. Dewey also seriously injured himself being the sole occupant of his vehicle. Witnesses identify Dewey as the driver of his vehicle and responding officers noted Dewey had an odor of alcohol on his person. Subsequent blood alcohol tests revealed Dewey had an .27 blood alcohol level. Police investigation determined that Calderon's vehicle had been stopped at the time of impact and Dewey's truck left no skid marks. Further, Dewey was determined to be driving on a suspended license and had four prior drunk driving convictions within the previous five years. At the time of the instance [*sic*] offense, a bench warrant had been issued for Dewey's arrest for absenteeism from a court-ordered alcohol program. When interviewed in a Los Angles area hospital, Dewey thought he was still in Santa Barbara. He did not know why or how he got to Los Angeles area. And I'll go ahead and correct the record. I previously indicated that Ms. Calderon (indiscernible). That's not correct in the summary of the crime. We'll go ahead and correct that.

      With respect to your previous record, the Panel noted that you have an escalating pattern of criminal conduct. You have a history of unstable and tumultuous relationships with others and that you had multiple runaways. You were living on the streets. You'd been placed in various facilities attempting to correct your behavior. Eventually, you wound up in the Youth Authority, juvenile probation, adult probation, all those were efforts of society to attempt to correct your criminality and that you obviously failed previous grants of probation. With respect to the unstable social history, it was noted that drugs and alcohol became a factor in your life at a very young age and only seemed to get worse to the point where you were able to, as you indicated, legally purchase the alcohol. That you moved into a -- alcohol of choice being hard alcohol as opposed to beer.

      With respect to your institutional behavior, the Panel noted that you've -- you failed to upgrade yourself educationally and vocationally. You've essentially vocationally haven't done anything since the mid 90's. And the Panel feels that you've had the time and that having an additional vocational certificates would certainly serve you very well coming before future Boards. And the Panel also

noted that you haven't sufficiently participated in self-help programs such as AA. I can indicate to you right now that AA is going to be an issue on every one of your Hearings and I can tell you at the time a date is granted, it goes up for review, and like I said, a very long sustained ongoing participation in AA would probably put the granting date in jeopardy.  We've seen these come back before where the Governor's office takes a look and says there's been insufficient participation in AA or NA.  And in your case, sir, the magnitude of your alcohol problem is such that I think you need to always have that as a very solid record.

With respect to your misconduct while incarcerated, you do have the 115 in January 25 of 2001 for circumventing security.  The Panel considered the psychiatric report prepared by Dr. Sterett in October of 2004, and the Panel noted that we found the report to be inconclusive and the only thing we did note is the doctor reaffirmed the issues of the need for participation in AA.  With respect to your parole plans, the Panel noted that future parole plans are intact and (indiscernible).

We did have a response from the Los Angeles Police Department indicating opposition to the granting of a date.  You were here, you heard the representative from the District Attorney's Office from the County of Los Angeles indicate opposition to granting a date.

The Panel also made the following findings, that your gains are recent and you need to demonstrate an ability to maintain these over an extended period of time. Nevertheless, we want to commend you for your six laudatory chronos that you've received since your last Hearing, your Buddhist studies and your above-average work reports that you've received when you were involved in the work activities. However, these positive aspects of your behavior don't outweigh the factors of unsuitability, and in a separate decision, the Panel finds it's not reasonable to expect that parole would be granted at a Hearing during the following two years, and the specific reason is as follows: and we will go to the commitment offense and without objection, I'll adopt by reference the previously read statement of facts from the 2000 Board report, in that there were multiple victims that were injured or killed.  We had one individual that was killed.  We had three people that were injured and basically, the feeling I had reading the report, these were more than injuries.  These were people that were maimed.  These people, some of which have had life altering injuries, losing eyes, various essential things to function as a functioning adult and human being.  The offense was carried out in a dispassionate manner.  You did indicate that you've driven many, many miles while in the same condition and nothing ever happened, so I don't know if you felt you established some unity, but in this particular case, as evidenced by the fog you described, you didn't know where you were.  You didn't know what you were doing, but you certainly knew that you'd done it before and, it's, again, just by luck of harms way that some other innocent victim, and yourself for that matter, you could find yourself up a tree somewhere and not know.  The offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering, and again, we focused on the magnitude of the

9

injuries and the death of (indiscernible) and the motive then -- there can be no motive for a crime like this.  It wasn't planned.  It was just the fact that you placed yourself in the position of causing this.  Criminality and misconduct, the Panel took note of the fact that you had five prior DUI convictions in a period of five years, and there was a warrant, an existing warrant because you weren't attending court-ordered alcohol programs.  We also noted in a separate decision that you did have the serious 115 in January 25, 2001.

      The Panel also in a separate decision noted that you've failed to participate in AA in an ongoing sustained manner.  You recognize AA, you said this to us, AA is a part of your life forever.  There is no option for you.  So having these little gaps in AA where you made choices and we respect your choices, but the Panel would be concerned that if you made other choices when you're in a free society to move away, one day could go to two, two could go to three.  We don't know that would happen, but if we had a period of sustained AA, where there is no absenteeism and there was no straying away from it, it would give a future Panel, I think a better feeling of confidence.  Therefore, the Panel noted that a longer period of observation and evaluation is going to be required before the Board could find that you're suitable for parole.

      Our recommendations to you, sir, are that you remain disciplinary free, if it's available, you update yourself vocationally and educationally, and if it's available, you get yourself back into AA.  And with that, I'll ask Commissioner Morris if he has any additional questions or comments?

      **DEPUTY COMMISSIONER MORRIS:**  I'm just going to close by saying that, Mr. Dewey, it sort of appears to me that you did your best work in preparing yourself for this kind of a Hearing.  You did your best work in the top of the 90's.  I'm talking between '91 and '94.  At that time you completed a couple of vocations, meat cutting and vocational drafting.  However, since' 71 (*sic*), you've done absolutely nothing to upgrade yourself academically.  You've got to do some things.  You've got to put some distance between the 2001 -- that serious disciplinary.  I encourage you, I applaud you for what you've done with the Buddhist principles, but I also encourage you to stay with additional self-help programming, particularly anything that relates to AA/NA, those kinds of things.  You going to have to do that.  And I think it will, in fact, be a life-long commitment for you.  You're a young guy, 53 years old, so you're going to have to arm yourself with as many tools as is possible so that you can override those triggers in the community once you get back out there.  You've done some -- you did some work early on, but you have much work left to do.  I think what you've done since the last Hearing has been, at best, sporadic.  I noticed you -- the only thing that's been constant is your Buddhist programming, but you've got to do more.  You've got to some more.  You've generated a number of laudatories, I want to commend you for that as well, continue to generate those favorable chronos to the extent that you can, okay?  With that, I'm just going to say good luck to you.

>    **PRESIDING COMMISSIONER GARNER:**  On a closing comment is the suggestions we've made to you today is that if you would approach them with the same passion that you have for your Buddhist and create a balance.  I mean, right now -- right now, there's very little doubt in my mind that you've totally committed to the Buddhist principles, but what we're asking you to do is balance it out and make yourself a more complete package, and with that I'll say that it is now 3 --
>    **ATTORNEY FRYE:** Commissioner, can I ask?
>    **PRESIDING COMMISSIONER GARNER:**  Pardon?
>    **ATTORNEY FRYE:**  Do you have to ask for a new psych report or (indiscernible)
>    **PRESIDING COMMISSIONER GARNER:**  Our difficult is that right now the whole issue of psych reports is up in the air. We could ask but we wouldn't know what the police [*sic*] is at the time of the Hearing, but if it's your request that we order a new report, I have no problem doing that.  But, again, I don't know what the status will be cause we've gone from yes, no, yes, no, three different times in about the last sixty days.
>    **ATTORNEY FRYE:**  If it's available, we'd like to have one.  Also, do we need to request a copy of the Hearing transcript?
>    **PRESIDING COMMISSIONER GARNER:**  That's provided to him. So now I'll say it is 3:54 p.m. and that concludes this Hearing.  Good luck to you, Mr. Dewey.[18]

This Court must decide the case on the law as it exists at the time it renders is decision and, if the law changes while the case is pending, this Court applies the new rule.[19]  Thus, although it establishes a new rule, the holding in *Hayward* is controlling.  In this case, this Court "need only decide whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or 'was based on an unreasonable determination of the facts in light of the evidence.'"[20]  By its reference to § 2254(d), the Ninth Circuit implicitly, if not explicitly, directed

---

[18] Docket No. 11-1, pp. 52-63.

[19] *See Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 281-82 (1969); *Lambert v. Blodgett*, 393 F.3d 943, 973 n.21 (9th Cir. 2004).

[20] *Hayward*, 603 F.3d at 563 (footnotes citing 28 U.S.C. § 2254(d) omitted).

this Court to apply § 2254(d) to the decisions of the California Supreme Court using the same standards as are applied to the determination of the law as established by the United States Supreme Court.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[21]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[22]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[23]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[24]  Consequently, it appears that, under the mandate of *Hayward*, this Court must canvas and apply California law as it existed at the time of the state court decision to the facts in the record as presented to the state court.

---

[21] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[22] *Williams*, 529 U.S. at 412.

[23] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[24] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

The mandate in *Hayward* is that this Court must review the decisions of state courts applying state law—in effect serving as a super-appellate court over state court decisions. This is in tension with the holdings of the Supreme Court. It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[25] A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[26] This principle applied to federal habeas review of state convictions long before AEDPA.[27] A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[28] It does not matter that the state supreme court's statement of the law was dictum if it is perfectly clear and unambiguous.[29]

---

[25] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[26] *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[27] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[28] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

[29] *Id.* at 76.

13

At the time of the decisions of the Board and the state courts in this case, the California "some evidence" rule was embodied in *Rosenkrantz* and *Dannenberg*. Subsequently, the California Supreme Court, applying *Rosenkrantz* and *Dannenberg*, decided *In re Lawrence*[30] and *In re Shaputis*.[31]

In *Rosenkrantz*, the California Supreme Court held:

> [. . . .] "Due process of law requires that [the Board's] decision be supported by some evidence in the record. Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. [. . . .] [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board] . . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision."[32]

The California Supreme Court then held:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. (Citations omitted.) Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant. [. . . .]
> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in

---

[30] 190 P.3d 535 (Cal. 2008).

[31] 190 P.3d 573 (Cal. 2008).

[32] *Rosenkrantz*, 59 P.3d at 218. Quoted with approval in *Shaputis*, 190 P.3d at 585.

respect to their threat to the public . . . ." (Pen.Code, § 3041, subd. (a).) "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date." ( Citation omitted.)[33]

In *Dannenberg* the California Supreme Court explained:

> [. . . .]  So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board [citing *Rosenkrantz*], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders. Section 3041 does not require the Board to schedule such an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.[34]

The California Supreme Court then held:

> Thus, there clearly was "some evidence" (citing *Rosenkrantz*) to support the Board's determination that Dannenberg's crime was "especially callous and cruel," showed "an exceptionally callous disregard for human suffering," and was disproportionate to the "trivial" provocation. Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole release date.[35]

---

[33] *Rosenkrantz*, 59 P.3d at 222; *see Shaputis*, 190 P.3d at 584-85 ("The record supports the Governor's determination that the crime was especially aggravated *and*, importantly, that the aggravated nature of the offense indicates that the petitioner poses a current risk to public safety." (emphasis in the original)).

[34] *Dannenberg*, 104 P.3d at 795.

[35] *Id.* at 803.

15

The Board must, however, "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.[36] The Board "may credit evidence suggesting the inmate committed a greater degree of the offense than his or her conviction evidences."[37] In *Lawrence*, however, the California Supreme Court rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness," holding:

> "[W]e conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety."[38]

This is the clarification upon which *Hayward*, *Pearson*, and *Cooke* rely, and it was the language in *Lawrence* to which this Court alluded in its Order, which the State declined to address.

With respect to the underlying commitment offense, the applicable regulation provides:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
    (C) The victim was abused, defiled or mutilated during or after the offense.

---

[36] *Id.* at 786-87, 802-803; *see Rosenkrantz*, 59 P.3d at 222.

[37] *Dannenberg*, 104 P.3d at 803 n.16 (citing *Rosenkrantz*, 59 P.3d at 219).

[38] 190 P.3d at 554-55; *see Cooke*, 606 F.3d at 1214.

    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.[39]

  The evidence clearly supports a finding that this case falls within the scope of (c)(1)(A) and probably falls within the scope of (c)(1)(E).  Under California law, a court neither re-weighs the evidence nor substitutes it's discretion for that of the Board.  Judicial review of a decision denying parole is "extremely deferential."[40]  Thus, under *Rosenkrantz* and *Dannenberg*, this Court could not say that the decision of the Los Angeles Superior Court was contrary to, or involved an unreasonable application of California law at the time it was decided, or was based on an unreasonable determination of the facts in light of the evidence.   On the other hand, because *Hayward*, *Pearson*, and *Cooke* require that *Lawrence* and *Shaputis* be applied, the decision of the Los Angeles Superior Court in this case was contrary to, or involved an unreasonable application of California law.

  While the record in this case might support an argument that the denial of Dewey's parole can be reconciled with *Pearson* and *Cooke*, the State has rejected the opportunity this Court gave to make that argument.  Instead, the State decided to stand on its position that *Hayward*, *Pearson*, and *Cooke* were wrongly decided and apparently void.

  The Board clearly found that Dewey's crime was atypical and his motive trivial.  This would be sufficient under *Rosenkrantz* and *Dannenberg*.  What the Board did not do, and the State expressly declined to address, is explain how events ending in 1988 show that Dewey

---

[39] Cal. Code. Regs., tit. 15, § 2402(c).

[40] *Rosenkrantz*, 59 P.3d at 210.

presented a significant risk to public safety in 2006, rendering it insufficient under *Lawrence* and *Shaputis*. Thus, under *Hayward*, *Pearson*, *Cooke*, this Court is compelled to find that the Board's denial of parole violated Dewey's liberty interest protected by the Due Process Clause of the Fourteenth Amendment.[41]

## V.  ORDER

Based upon the foregoing,

**IT IS HEREBY ORDERED THAT** the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 is **GRANTED**.

**IT IS FURTHER ORDERED THAT** the denial of parole is vacated and this matter is remanded to the California Board of Parole Hearings for further proceedings consistent with the decisions of the California Supreme Court in *In re Lawrence*, 190 P.3d 535 (Cal. 2008), and *In re Shaputis*, 190 P.3d 573 (Cal. 2008),[42] as interpreted by *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc),  *Pearson v. Muntz*, 606 F.3d 606 (9th Cir. 2010) (per curiam), *Cooke v. Solis*, 606 F.3d 1206 (9th Cir. 2010), and *Pirtle v. California Board of Prison Terms*, 611 F.3d 1015 (9th Cir. 2010).

---

[41] In reaching this conclusion, this Court is mindful of the following significant problems: (1) the applicability of *Lawrence* and *Shaputis* to cases in which the state court decision became final prior to August 21, 2008; and (2) the appropriate scope of review by federal courts in federal habeas proceedings under 28 U.S.C. § 2254(d) of the application by the California courts of the California "some evidence" rule.  In other words, to what extent may subsequent California cases modify the "liberty interest" established by California law and recognized in *Hayward*, *Pearson*, and *Cooke*.

[42] *See In re Prather*, 234 P.3d 541, 550-54 (Cal. 2010); *Haggard v. Curry*, --- F.3d ---, 2010 WL 4015006 (9th Cir. October 12, 2010).

**IT IS FURTHER ORDERED THAT**, if the Board of Parole Hearings has not held a hearing within 120 days of the date of entry of this Order, the Secretary, California Department of Corrections and Rehabilitation, must release Bowie to parole status.

**IT IS FURTHER PROVIDED THAT** nothing in this Order is intended to, nor may it be construed as, restricting or otherwise inhibiting, directly or indirectly, the authority of the Secretary, California Department of Corrections and Rehabilitation, to set restrictions or conditions on the grant of parole to the extent otherwise provided by the laws of the State of California.

The Clerk of the Court is to enter final judgment accordingly.

Dated:  December 1, 2010.

/s/ James K. Singleton, Jr.  
JAMES K. SINGLETON, JR.  
United States District Judge